**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PNC BANK, NATIONAL ASSOCIATION,** | ) ) ) | Case No.: 1:10-cv-01349-PAG |
| | ) | **JUDGE PATRICIA A. GAUGHAN** |
| Plaintiff, | ) ) | |
| vs. | ) ) | **MEMORANDUM IN SUPPORT OF MOTION FOR APPOINTMENT OF RECEIVER** |
| **INDUSTRIAL TRANSPORT, INC.,** *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION
FOR APPOINTMENT OF RECEIVER**

**A.    FACTS**

On or about September 6, 2000, Industrial Transport, Inc. ("IT") entered into a Commercial Note with PNC Bank, N.A.'s ("PNC") predecessor, National City Bank ("NCB"), under which IT received a line of credit in the amount of $1,500,000.  As security for the debt, IT entered into a Security Agreement dated September 6, 2000 (the "First Security Agreement"), a copy of which is attached as Exhibit A, under which IT pledged all of its personal property and fixtures.  Among other things, the First Security Agreement stated that "Bank shall have full power and right to exercise any and all rights in respect of the Collateral as if Bank were the sole beneficial owner thereof . . . ."  (Ex. A, at 3).  The First Security Agreement also stated that "Bank shall have the right to sell or otherwise dispose of the Collateral or any part thereof or any interest therein at any time or from time to time."  (Ex. A, at 3).

The facts are set out more fully in the Complaint, but it suffices to say that between February 5, 2003, and December 10, 2007, NCB and IT entered into a series of nine amendments to the Commercial Note in order to provide IT with additional funding.

On or about January 12, 2006, IT, its principals, and NCB entered into a Forbearance Agreement that served to restructure the Commercial Note and its Amendments.[1] As part of the forbearance, IT signed a Security Agreement dated January 12, 2006, a copy of which is attached as Exhibit B (the "Second Security Agreement").  The Second Security Agreement conferred broad powers on NCB to enforce its security interest, including the right to "enter any premises where the Collateral is located, and take possession of the Collateral or remove the Collateral from such premises" and to "retain, take control of or manage all or any Collateral." (Ex. B, at 6).

On December 10, 2007, IT executed and delivered to NCB a Promissory Note in the amount of $3,050,000.00 due to be paid on or before June 10, 2009, and contemporaneously entered into a Commercial Security Agreement, a copy of which is attached as Exhibit C (the "Third Security Agreement").[2]  Under the Third Security Agreement, IT agreed that upon any event of default:

> Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.

(Ex. C, at 4).

Most recently, on June 1, 2009, IT and NCB entered into a Modification of Promissory Note, under which the maturity date of the December 10, 2007 Promissory Note was extended to June 1, 2010.  That date has arrived, and IT has failed to pay the indebtedness evidenced by this Promissory Note, constituting an Event of Default under the terms of the loan documents.  IT has

---

[1] On the same date, Intrans and IRS executed and delivered to PNC Guaranty agreements for the indebtedness of IT.

[2] On the same date, IISL executed and delivered to PNC a Guaranty of the indebtedness of IT.

indicated to PNC that it is unable to satisfy its obligations while continuing its operations. PNC seeks the appointment of a receiver to seek the infusion of new investment capital; to stabilize customer relations; to evaluate existing contracts and to pursue new contracts if beneficial to the company; to deal with the claims of IT's secured and unsecured creditors; to explore whether IT could or should be sold as a going concern and to effectuate such a sale if appropriate; to evaluate the assets, operations, and financial condition of IT; and, if necessary, to take all required steps to effectuate and oversee the orderly liquidation of the collateral, in a way that will maximize its value for creditors. It is expected that IT's current management will remain in place, subject to the receiver's control and supervision, to assist the receiver in accomplishing the foregoing tasks.

**B.  LAW & ARGUMENT**

    **1.  Appointment of a Receiver is Appropriate under Federal Law**

Federal standards determine whether a receiver should be appointed in a diversity action, and Federal Rule of Civil Procedure 66 states generally that cases involving receivers are subject to the Federal Rules. *See Resolution Trust Corp. v. Fountain Circle Assocs. Ltd. P'ship*, 799 F. Supp. 48, 50 (N.D. Ohio 1992); *see also Fed. Nat'l Mortg. Ass'n v. Mapletree Investors Ltd. P'ship*, No. 10-cv-10381, 2010 WL 1753112, at *2 (E.D. Mich. Apr. 30, 2010) ("Although the Sixth Circuit itself has not addressed the issue, the weight of authority suggests that appointment of a receiver in a diversity action is controlled by federal law, not state law.").[3]

Whether to appoint a receiver rests in the Court's exercise of equitable discretion, and a number of relevant factors guide that discretion. *Wells Fargo Bank Minn., N.A. v. Finelli*, No.

---

[3] Assuming that state law applied, Ohio Revised Code § 2735.01 authorizes the appointment of a receiver under similar circumstances, including "[w]hen a corporation . . . is insolvent, or is in imminent danger of insolvency" and "[i]n all other cases in which receivers have been appointed by the usages of equity."

3

5:06-CV-1922, 2006 WL 2864381, at *2 (N.D. Ohio Oct. 4, 2006).  These factors include: "fraudulent conduct by the defendant; imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; inadequacy of available legal remedies; lack of less drastic equitable remedies; and, likelihood that the appointment will do more good than harm." *Id.*; *see also* Wright, Miller & Marcus, 12 FED. PRAC. & PROC. CIV. § 2983 (2d ed. 2010).

In this case, while PNC is not asserting that IT, its directors, officers or management has engaged in fraudulent conduct, mismanagement of the business of IT or the wasting of assets, IT is financially unable to continue its operations without the further extension of credit, and PNC is not in a position to extend it additional credit under the current circumstances.  Simply relying on legal remedies to collect debts will be inadequate given that it already appears that IT's debts exceed the value of its assets.  If IT's business is left to collapse and its assets are further reduced in value, PNC will suffer much greater losses on its loans to IT, and other creditors will also be harmed.

If a receiver were appointed, the receiver could assume responsibility for continuing to provide IT's services and maintaining its vendor relationships, which are potentially the most valuable parts of the business.  If the receiver determines that such a course would maximize the value of IT and its property, a receiver could ensure that the company remains viable for purchase by a new investment group or for further restructuring of the debt.  In contrast, the immediate cessation of IT's business operations, which is likely to occur in the absence of a receiver, could result in significant depreciation in the value of IT's assets.

Allowing a receiver to assume these responsibilities would entail some expense, but that expense would be justified, in that the value of IT's assets would be maximized or at least stabilized, ultimately producing a sale that will benefit IT by reducing its debts to PNC and other creditors.

Appointing a receiver is particularly important given that a significant part of IT's property consists of movable trucks and trailers located across the country. The reach of federal court jurisdiction is necessary to ensure that these assets are protected. IT presently has operations and equipment in Ohio, Michigan, California, Illinois, Missouri, and Wisconsin. These assets could be lost or mismanaged without close supervision by a receiver during these proceedings.

In addition to the factors articulated above, another factor entitled to consideration is that IT agreed that PNC would have broad rights to protect its collateral in case of an Event of Default. *See Fed. Nat'l Mortgage Ass'n*, 2010 WL 1753112, at *3 (parties' consent to the appointment of a receiver is "a strong factor weighing in the plaintiff's favor"); *see also Alden Park, LLC v. Anglo Irish Bank Corp.*, No. 08-12116, 2009 WL 499157, at *6 (E.D. Mich. Feb. 26, 2009) (appointing a receiver based on the terms of the loan documents and because of the threat to property value). Indeed, as discussed above, the Third Security Agreement explicitly authorized PNC to seek appointment of a receiver (*see* Ex. C, at 4), and the First Security Agreement and Second Security Agreement conferred rights on PNC akin to those that would be held by a receiver (*see* Ex. A, B).

Because immediate termination of IT's business operations will result in a significant depreciation in the value of IT's assets, PNC asks that the Court appoint a receiver to protect the assets and recoup the best possible value for them by sale or otherwise.

C. **CONCLUSION**

For all the foregoing reasons, PNC requests that this Court appoint a receiver (1) to take control of, market and sell IT's assets; and (2) to take any and all actions authorized in the attached Order Appointing Receiver, all in an effort to maximize the value of the assets for the benefit of creditors. IT does not oppose the appointment of a receiver for the purposes

articulated herein. Recognizing the Court's discretion in this regard, PNC respectfully recommends Meridian Advisors of Ohio for the role of receiver. The firm's credentials are described on attached Exhibit D. A proposed Order Appointing Receiver is attached hereto.

    Respectfully submitted,

    VORYS, SATER, SEYMOUR AND PEASE LLP

    /s/ John Winship Read
    John Winship Read (0030827)
    Drew T. Parobek (0016785)
    Jennie L. Church (0080562)
    Elizabeth A. Davis (0082186)
    2100 One Cleveland Center
    1375 East Ninth Street
    Cleveland, Ohio 44114-1724
    (216) 479-6100
    (216) 476-6060
    jwread@vorys.com
    dtparobek@vorys.com
    jlchurch@vorys.com
    eadavis@vorys.com

    *Attorneys for Plaintiff, PNC Bank, National Association*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been sent by via regular U.S. mail, first class, postage prepaid this 17th day of June, 2010, to the following:

Daniel A. DeMarco
Hahn, Loeser & Parks LLP
200 Public Square
Suite 3300
Cleveland, Ohio 44114-2301

*Attorney for Industrial Transport, Inc.,*
*Industrial Inventory Solutions, Inc.,*
*Industrial Repair Services, Inc., and Intrans, Inc.*

    /s/ John Winship Read
    *One of the Attorneys for*
    *PNC Bank, National Association*